Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000009
31-OCT-2018
03:19 PM

NO. CAAP-16-0000009

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
MATTHEW K. CHUNG, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 14-1-0769)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Reifurth, JJ.)

Defendant-Appellant Matthew K. Chung (**Chung**) appeals from the Judgment of Conviction and Sentence (**Judgment**) entered against him and in favor of Plaintiff-Appellee the State of Hawai'i (**State**) on December 9, 2015, in the Circuit Court of the First Circuit (**Circuit Court**).[1] After a jury trial, the Circuit Court entered the Judgment convicting Chung of: (1) Attempted Murder in the Second Degree, in violation of Hawaii Revised Statutes (**HRS**) §§ 705-500 (2014)[2], 707-701.5 (2014)[3], and 706-656

---

[1]    The Honorable Dexter D. Del Rosario presided.

[2]    HRS § 705-500 provides, in relevant part:

> **§ 705-500  Criminal attempt.**  (1) A person is guilty of an attempt to commit a crime if the person:
>     . . .

(continued...)

(Supp. 1993 and 2013)[4]; (2) Carrying or Use of Firearm in the Commission of a Separate Felony in violation of HRS § 134-21 (2011)[5]; and (3) Place to Keep Pistol or Revolver in violation of § 134-25 (2011).[6]

---

[2](...continued)

        (b)    Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

    (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

    (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

[3]    HRS § 707-701.5 provides, in relevant part:

    **§ 707-701.5 Murder in the second degree.** (1) [A] person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

    (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[4]    HRS § 706-656 provides, in relevant part:

    **§ 706-656 Terms of imprisonment for first and second degree murder and attempted first and second degree murder.**

    . . . . 

    (2) Except as provided in section 706-657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole.

[5]    HRS § 134-21 provides, in relevant part:

    **§ 134-21 Carrying or use of firearm in the commission of a separate felony; penalty.** (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]

[6]    HRS § 134-25 provides, in relevant part:

(continued...)

I.    BACKGROUND

On May 8, 2014, Chung was indicted by grand jury on one count of Attempted Murder in the Second Degree, one count of Carrying or Using a Firearm in the Commission of a Separate Felony, to wit, Attempted Murder in the Second Degree, and one count of Place to Keep Pistol or Revolver, arising out of an incident on April 26, 2014, in which the complainant suffered gunshot wounds to the chest and arm purportedly while riding as a passenger in Chung's vehicle.

HPD Criminalist Rebecca Bryant (**Bryant**) testified first for the State.  In April 2014, Bryant worked as an HPD evidence specialist, whose duties included responding to the scene of an investigation, photographing and diagraming the scene, recovering evidence, processing for latent fingerprints, and recovering biological evidence.

On April 26, 2014, she was called out to Pali Momi Hospital, to the emergency room valet area, to take photographs and accept further direction from the detective on scene.  When she arrived at approximately 5:50 p.m., she noted an orange cone placed over "an absorbent material with something that appeared to be blood-like."  She photographed the material where it lay on the ground and swabbed it for processing.  She also photographed

---

[6](...continued)
        § 134-25 Place to keep pistol or revolver; penalty.
        (a) Except as provided in sections 134-5 and 134-9, all
        firearms shall be confined to the possessor's place of
        business, residence, or sojourn . . . .
        (b)   Any person violating this section by carrying or
        possessing a loaded or unloaded pistol or revolver shall be
        guilty of a class B felony.

the area.[7] She also received clothing from an officer on the scene, consisting of a shirt, a pair of shorts, and a pair of shoes, all of which showed a blood-like substance on them. She photographed the clothing and sealed the items for processing.

Later that day, Bryant reported to the Kapolei police station and photographed the exterior and interior of a white Kia Rio. Bryant collected gunshot residue samples from the Kia, and she tested the ceiling of the car and the driver's side seat, focusing on the head rest and the arm rest, the front, right passenger seat, and the backseat. Also at the Kapolei police station, on April 27, 2014, Bryant collected gunshot residue samples from Chung. Finally, Bryant reported to Queen's Hospital to photograph the complainant, Shylo Quemado-Moniz (**Shylo**). She photographed Shylo's left side, where he showed wounds to his torso and left arm.

Bryson Galicinao (**Galicinao**) testified next. On April 26, 2014, Galicinao was working as a valet at the Pali Momi Hospital, where his duties included assisting the emergency room patients when they arrived at the entrance. While standing behind the podium, a white car "going pretty quick down the ramp" entered the valet area. Galicinao witnessed one man driving and one sitting in the backseat.[8] Upon parking in the valet area, the driver exited the vehicle and said, "Guys, I need help. My

---

[7] The jury was shown the video footage from surveillance cameras. Bryant's photographs were also shown to the jury and admitted into evidence.

[8] When asked to describe the driver, Galicinao testified that he was male, of thin build, probably 5'6" or 5'7" but when asked if he would be able to recognize the driver again, Galicinao responded, "Maybe. Maybe not." He did not identify Chung at trial; however, it is undisputed that Chung was the individual Galicinao witnessed.

friend is hurt." The driver then opened the door and assisted the valets in taking the injured man from the backseat. The injured man was bleeding "everywhere" so Galicinao assisted him quickly. The valets took the injured man directly to the emergency room for treatment, at which time the driver left.

Galicinao described the driver's demeanor as "scared." During cross-examination, Galicinao described that the driver of the car seemed to be in a hurry but observed that he parked in the correct place in the valet area.

Emergency Room Doctor Misha Kassel (**Dr. Kassel**) testified that he is an emergency medical physician at Pali Momi and Kapiolani. On April 26, 2014, Dr. Kassel treated Shylo at approximately 4:15 p.m. Dr. Kassel observed that Shylo was conscious and breathing but that there were gunshot wounds to his chest and his left arm. He appeared to Dr. Kassel to be coherent and able to communicate.

Dr. Kassel testified that the wounds on Shylo's left chest initially caught his attention, as "the location is concerning because on the left-side of your chest you have your heart." He checked Shylo for "airway, breathing, and circulation, checking the pulses and stuff [and] all those things were intact." Dr. Kassel ordered an X-ray to check for bullet fragments or whether there was possibly a small lung collapse he was unable to hear. He requested an ultrasound to check for fluid collecting around the heart.

He assessed Shylo further for any other urgent operating needs but most of his preliminary bedside findings were

negative.  The X-ray, however, was not normal, showing several little bullets or "BBs . . . kind of like a bird shot" near Shylo's heart, inside the chest cavity.  Shylo did not require immediate surgery, but Dr. Kassel transferred Shylo to a higher level of care at Queen's Hospital, "since they're a trauma hospital."

In his physician's report, Dr. Kassel indicated that Shylo's wounds created a substantial risk of death.  When asked to explain his reasons for doing so, Dr. Kassel testified that "with gunshot wounds to the chest cavity, there's always a significant chance of death happening. . . . [H]aving a bunch of small bullets inside the chest cavity posed a risk to life, in my opinion."  Dr. Kassel acknowledged writing on Shylo's form that there was "no active bleeding" from Shylo at the time he was treated.

During cross-examination, Dr. Kassel was asked to further explain the factors attributing to a conclusion of whether a wound carried a substantial risk of death.  In the case of two gunshot wounds affecting the left side of the chest, near the heart, Dr. Kassel believed that "any ER physician" would say it poses a substantial chance of death.  However, he explained certain exceptions to that conclusion, depending on how deep the wound has entered into the chest cavity, if at all, the size of the ammunition that penetrated the chest, whether the bullet(s) hit the heart or a major artery, and the physical condition of the individual, including his or her age.  Nonetheless, Dr. Kassel noted that even if the victim is younger, "[i]t doesn't

mean that a gunshot wound to your chest does not pose a threat to your life."   "[I]f you have . . . a gunshot wound to the chest and it enters the chest cavity, I'm going to check that same box whether you're two years old or you're 90 years old."

In assessing the wound to the left arm, Dr. Kassel noted that no major artery was hit and that those injuries did not create a substantial risk of death.  Dr. Kassel also ordered an X-ray of the arm and recalled that it did not appear to have any broken bones.  Dr. Kassel was not certain whether there were similar pellets in Shylo's arm as there were in his chest.

Joshua Arakawa (**Josh**) also testified for the State. Josh and Chung became friends after high school, approximately three or four years prior to the shooting.  Josh also knew Shylo. Josh would hang out with Chung and Shylo on a regular basis in April 2014 and had considered them both to be his good friends.

When questioned about the incident on April 26, 2014, Josh testified that he could not recall whether he was hanging out with Shylo and Chung.  He was able to identify Chung in the courtroom but denied hanging out with him "every day."  He testified that he did not know if he was in the car when Shylo was shot and that he did not remember Chung shooting Shylo.  He did not remember speaking with Detective Kalahui about the incident.  When presented with his statement to the police, Josh acknowledged he had seen it, but he forgot having made the statement.  He said he was "doing choke drugs," including methamphetamine, marijuana, "crack," and cocaine, and "was just saying stuff."  He testified that he was not paying attention to

the days he would hang out with Chung in April 2014 and did not remember the names of the other boys he used to hang out with in Kapolei.

During cross-examination, Josh testified that he did not know Hunter Reed-Young (**Hunter**) and that he did not actually know Shylo back in April 2014 but only met him recently. At the time of trial, Josh was living at Shylo's grandmother's house.

Hunter also testified for the State. He had known Chung since high school, although they were in different years. He also knew Shylo as his "friend's friend" and had known him for a couple of years prior to April 2014. He had known Chung for about a year longer than he had known Shylo.

Hunter described a group of about fourteen individuals that he would see on a daily basis in April 2014, including Chung, Shylo, and Josh, as well as other boys known only by their nicknames. Some of the boys were homeless and would gather behind the Walmart in Kapolei in an area they referred to as the "tunnels" to smoke marijuana and methamphetamine. Of the group, Shylo and Chung were the only ones who had their own cars.

When asked whether Chung's behavior and demeanor began to change in April 2014, Hunter testified that he could not remember but that they all changed because "when you do that drug, everybody acts differently." Hunter testified that he often felt paranoid himself because he did not want his parents knowing that he was abusing drugs, and that they were all paranoid of cops.

Hunter recalled speaking to the detective in May 2014. When shown his statement, Hunter testified, "I can tell I was high on this. I really don't remember all of this." He acknowledged telling the detective that he was "kind of moving away from riding with [Chung]" but that he was on drugs when he spoke to the detective and could not remember. He did not remember telling the detective that it bothered Chung that the "guys were choosing to ride with Shylo" or that Chung was "kind of weirding out." He did not remember seeing Chung talking to people who were not there or answer questions that none of them had asked him.

On the morning of the incident, Hunter remembered meeting at the McDonald's in Kapolei with some of the boys from the group, including Shylo, Josh, and Chung. Shylo, Chung, and Josh all left in Chung's car. Hunter did not remember any fighting going on between any of them. Hunter never told Chung to shoot Shylo but remembered the detective discussing that with him. He confirmed that he had no reason to want to shoot Shylo. Hunter did not witness Shylo being shot but remembered his friend, "Noods" (also known as Raymond Tasaka), telling him that Josh had come down the hill to the Walmart saying that Chung shot Shylo.

Hunter did not recall ever observing Chung in possession of a gun. He recalled reading in the police report that he had seen him with a gun multiple times but did not remember this fact while testifying. He explained that he was high and "it was dumb" for him to tell that to the detective but

that "now, in a sober mindset," it was not true and he had never seen Chung with a gun.

Shylo testified next for the State. He testified that, in 2008, he and Chung had been classmates at Kapolei High School but were not close friends. After high school, by about 2013, he and Chung were pretty good friends and began hanging out more in the same "close circle." By April 2014, he was also friends with Hunter, Josh, "Noodles", and some other boys, who would see each other almost every day. During April 2014, Shylo was living with his grandparents in Makakilo. Some of the other boys, though, were homeless because they "basically chose not to go home." Instead, they spent much of their time behind Walmart in a place they referred to as the "tunnels."

Shylo described his relationship with Chung at the time as "like normal friends" but that Chung had started to "act a little odd." He would act as though someone was talking to him or answering questions but no one had said anything. Some of the other boys had begun to act strange as well, "but not like answering questions that haven't been asked or anything like that." Chung, along with Shylo and the other boys, were smoking methamphetamine at that time. At some point, the boys in the group seemed to want to "go with" Shylo rather than Chung.

The night before the incident, Shylo had slept at the tunnels. He had smoked methamphetamine that night but, at trial, Shylo denied smoking that morning.[9] Shylo did not have his car

---

[9] Shylo acknowledged that he told a detective that he had smoked marijuana and methamphetamine that morning. While he did not disagree with
(continued...)

that day and met up with Chung and Josh at the McDonald's that was located across from the tunnels.  From there, Shylo, Josh, and Chung left in Chung's car and began driving up Makakilo.  Shylo was seated in the backseat, behind the passenger seat.

Shylo testified that, at that point, he fell asleep.  The next thing he remembered was waking up to the sound of two gunshots.  He felt a vibrating sensation in his arm and on his upper left torso.  He then looked at his arm and noticed there was some blood.  Then he saw the bullet entry wound in his arm and realized he had been shot.  Immediately after this, Chung pulled over the car across from Makakilo Gardens.  Josh jumped out of the car, saying, "What the fuck? Why did you do that?" and told Chung to get Shylo to the hospital.  Shylo testified that Josh looked "puzzled."  Chung and Shylo drove away, Chung drove first to Saint Francis Medical Center, but it was closed, so he drove to Pali Momi.

While they were driving to the hospital, Shylo heard Chung say that he did not know why they had him do this.  Shylo also heard Chung say he was sorry, that he did not know why he did it, and that Hunter had said to do it.  Shylo also heard Chung say something like, "Hang in there.  Don't die on me."  Shylo did not remember Chung saying anything else.  Once they arrived at Pali Momi, Chung helped Shylo out of the car and into a wheelchair.

[9](...continued)
having made the statement, he also testified that he was not under the influence in the morning.

While at the hospital, a detective spoke to Shylo about the incident.  Shylo did not want to speak to the detective initially because Chung was a friend.  He told the detective that he did not know who shot him and that he did not want to pursue charges.  Shylo testified that he was not "completely upfront" at first with the detective but that about three or four days later, after he spoke with his family and close friends, he was willing to speak honestly with the detective.

Shylo testified that he suffered four gunshot wounds from the incident.  He experiences difficulty breathing sometimes and cannot lift weights or anything heavy as much as he once could.  There are still bullet fragments in his chest and arm. He does not like being around too many people any more.

Shylo testified that he did not know why this happened. There was no "bad blood" between him and Chung.  He did not owe him money or drugs and there had been no arguments between them prior to the incident.  They were very good friends at the time and even knew each other's families.  However, at the time of the incident, Shylo had told the detective that he thought Chung was possibly jealous and explained that the boys all wanted to get in Shylo's car instead of going with Chung, because of the way Chung would behave sometimes.  Shylo testified that he "didn't know why [he] said that" to the detective but that it was the only thing he could think of at the time.

Shylo testified that he had maybe once seen Chung in possession of a "revolver type gun."  He did not see a gun at all during the incident when he was shot.

Detective Derrick Kalahui (**Detective Kalahui**) testified next. In April 2014, Detective Kalahui was a detective with the HPD Criminal Investigation Division. He interviewed Shylo at Queen's Hospital the day following the shooting. Based on the information he learned from Shylo, he subsequently interviewed Hunter and Josh. While Hunter was considered a possible suspect, Josh was not. Both Josh and Hunter appeared coherent at the time Detective Kalahui questioned them.

Chung testified in his defense. In April 2014, Chung was living with his parents and his sister. On the morning of April 26, 2014, he left his home in his car and picked up Josh on the way into Kapolei. They met with their other friends, including Hunter and Shylo, at the McDonald's in Kapolei and from there, Josh, Shylo, and Chung left in Chung's car.

Chung remembered driving up Makakilo Drive and stopping at the Makakilo Gardens. There, Josh got out of the car and left for a while before returning to the car. While Josh was away, Chung and Shylo stayed in the car to smoke methamphetamine.

Chung could not remember exactly what happened after that. He testified that when he smokes methamphetamine he is "kind of out of it" and "mix[es] up one thing with another," so he "forgets things a lot."

Chung remembered seeing Shylo bleeding and taking him to the hospital but did not "remember that Shylo appeared to have been shot in [his] car." Chung testified that when he saw Shylo bleeding, he panicked because his friend had been hurt. Chung did not remember driving back down Makakilo Drive but he

remembered driving Shylo to the hospital, first to Saint Francis and then to Pali Momi. He did not recall having said anything to Shylo during the drive. He remembered taking Shylo out of the car and helping him at the hospital.

Chung did not remember shooting Shylo and denied that he had shot him. Chung did not know who shot Shylo and did not want to testify that Josh was the one who shot Shylo; but he acknowledged that only the three of them were in the car at the time he discovered Shylo was bleeding. He remembered the "major points in that day" but testified that "everything else is kind of a blur."

Chung testified that as soon as he dropped off Shylo at the hospital, he left because he did not know what else to do. He did not know whether he thought he was in trouble but he just thought he should not stay there. He did not remember where he went after that.

Chung testified initially that he did not have a gun at all that day, but then clarified that he remembered shooting a .22, long-shot rifle, earlier in the day while he was "playing" and shooting birds with it, using real bullets. He testified that he had held a pistol at one time but that he did not have a handgun in his car at any time that day.

In addition to this testimony, the parties stipulated to the following facts, and the Circuit Court admitted them into evidence:

> 1. That on April 26, 2014, in the City and County of Honolulu, State of Hawai'i, [Chung] did not have a license to carry a pistol or revolver and ammunition

issued by the Chief of Police of the City and County of Honolulu, State of Hawaiʻi.

2. That Kaleo Kaluhiokalani is a Criminalist for the Honolulu Police Department Scientific Investigation Section and is an expert in the area of trace evidence with a specialty in gunshot residue analysis. Gunshot residue consists of microscopic particles that are expelled from open areas of a gun or firearm when it is fired. The examiner looks for the elements of lead, barium, and antimony in a single particle. Gunshot resid[u]e is usually referred to as "GSR".

3. On August 6, 2015, at 1200 hours, Kaleo Kaluhiokalani received two sealed GSR kits from [the] evidence custodian . . . . The GSR kits consisted of two separate samples of gunshot residue obtained by evidence custodian Rebecca Bryant on April 26th and April 27th, 2014, respectively. The first sample was GSR or gunshot residue, collected from the front, rear, and ceiling of a Kia Rio vehicle. . . The second GSR or gunshot residue sample was collected from the back and palm of both hands of Matthew Chung.

4. With respect to the GSR samples collected from the surface areas of the Kia Rio vehicle, a total of 20 particles characteristic of Gunshot Residue were confirmed. Kaluhiokalani concluded that 1) a firearm was discharged in close proximity to those surface areas of the Kia Rio; and/or 2) an item contained —— contaminated with GSR came into contact with those surface areas of the Kia Rio.

5. With respect to the second gunshot residue sample collected from [Chung's] hands, Kaleo Kaluhiokalani found three particles characteristic of gunshot residue [on Chung's] hands. Kaluhiokalani concluded that 1) [Chung] may have discharged the gun; 2) [Chung] may have been in the vicinity of a gun when it was discharged; and 3) [Chung] may have come into contact with an item with gunshot residue on him.

On August 27, 2014, the jury returned a verdict finding Chung guilty as charged on all counts. On December 9, 2015, Chung was sentenced to life in prison with the possibility of parole for count one, a twenty-year term of incarceration for count two, and a ten-year term of incarceration for count three, to be served concurrently.

On January 7, 2016, Chung filed a notice of appeal.

II. POINTS OF ERROR

On appeal, Chung asserts three points of error, contending that: (1) there was no substantial evidence to

15

support Chung's convictions; (2) the deputy prosecuting attorney (**DPA**) committed prosecutorial misconduct by asserting in his closing argument that Chung lied; and (3) the Circuit Court erred in failing to instruct the jury on the lesser-included offense of Reckless Endangering in the Second Degree.

III. APPLICABLE STANDARDS OF REVIEW

The court reviews the sufficiency of the evidence for whether,

> upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a *prima facie* case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged.
>
> Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

State v. Grace, 107 Hawai'i 133, 139, 111 P.3d 28, 34 (App. 2005) (citation omitted; format altered).

In the absence of a defense counsel objection at trial to prosecutorial misconduct, this court "may nevertheless recognize such misconduct if plainly erroneous." State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003). "We may recognize plain error when the error committed affects substantial rights of the defendant." State v. Cordeiro, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002) (citation and internal quotation marks omitted). However, the court will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct, unless "there is a reasonable

possibility that the misconduct complained of might have contributed to the conviction." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999). In assessing whether prosecutorial misconduct warrants a new trial, the Hawai'i Supreme Court has set forth three factors to consider: "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." State v. Pacheco, 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001).

> Finally, with respect to jury instructions:
>
> > When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.
> >
> > Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.
> >
> > Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.
> >
> > If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. Gonsalves, 108 Hawai'i 289, 292-93, 119 P.3d 597, 600-01 (2005) (citations, internal quotation marks, and brackets omitted; format altered) overrules on other grounds State v. Auld, 136 Hawai'i 244, 361 P.3d 471 (2015).

> > [W]ith respect to instructions on lesser-included offenses, it is axiomatic that providing instructions on all lesser-included offenses with a rational basis in the evidence is essential to the performance of the jury's function. Thus, pursuant to this court's precedent, jury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict

> acquitting the defendant of the offense charged and convicting the defendant of the included offense.

State v. Flores, 131 Hawai'i 43, 51, 314 P.3d 120, 128 (2013) (citations and internal quotation marks omitted).

III. DISCUSSION

A. Sufficiency of the Evidence

Chung asserts that the State presented insufficient evidence to convict him of any of the offenses for which he was charged. Chung first asserts that the State presented insufficient evidence of the requisite criminal conduct for attempted murder in the second degree, i.e., that Chung fired the gun that caused Shylo's injuries. In support, Chung points to: (1) the absence of any witnesses who saw Chung shoot Shylo; (2) Josh's failure to recall or testify regarding any details of the incident; (3) the testimony from Shylo that he never saw a gun in the car and never saw Chung fire a gun; (4) HPD Criminalist Kaluhiokalani's findings that the gunshot residue on Chung's hands could have resulted from Chung being in the vicinity of a gun being discharged or Chung coming into contact with an item with gunshot residue on it; (5) Chung's testimony that he fired a rifle earlier in the day; (6) Chung's denial of making any inculpatory statements; and (7) Chung's denial that he shot Shylo.

In order to convict Chung of Attempted Murder in the Second Degree, the State was required to present substantial evidence that he intentionally engaged in conduct that is a substantial step in a course of conduct intended or known to

18

cause the death of Shylo. See HRS §§ 705-500, 707-701.5, 706-656; see also HRS § 702-206 (2014).[10]

Despite testifying that he did not see a gun or who shot him, Shylo did testify that: he was in the car with only two other individuals (including Chung); he woke up to the sound of gunshots; he observed a gunshot wound in his arm; and he heard Chung say that he was "sorry" and did not know why he did it. Although Chung did not recall having made such statements, it is evident from the verdict that the jury did not believe Chung's testimony in this regard. This court will not "pass upon" issues dependent on witness credibility. See State v. Jhun, 83 Hawai'i 472, 483, 927 P.2d 1355, 1366 (1996).

As to the forensic stipulations regarding the gunshot residue, a reasonable conclusion was that Chung had discharged

---

[10]     HRS § 702-206 provides, in relevant part:

> § 702-206 Definitions of states of mind. (1) "Intentionally."
> (a)     A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct.
> (b)     A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they exist.
> (c)     A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.
> (2)     "Knowingly."
> (a)     A person acts knowingly with respect to his conduct when he is aware that his conduct is of that nature
> (b)     A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.
> (c)     A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

the gun.[11] Additionally, gunshot residue was found in the car in which Shylo was riding at the time he heard the sound of gunshots and discovered he had gunshot wounds. From this it can be reasonably inferred that a gun was fired in the car at the time Shylo heard the shots and that Chung was the individual who fired it. Combined with Shylo's testimony that Chung made inculpatory statements as they drove to the hospital, there is evidence of "sufficient quality and probative value to enable a person of reasonable caution" to conclude that Chung fired the gun that caused Shylo's injuries. See State v. Agard, 113 Hawai'i 321, 324, 151 P.3d 802, 805 (2007).

Chung further asserts that even if the State presented sufficient evidence that Chung had shot Shylo, there was insufficient evidence that Chung "had taken a substantial step in a course of conduct that he intended or knew was practically certain to cause Shylo's death" because: (1) the ammunition used was not the type that would be expected to cause death; (2) no fragments hit Shylo's heart, major arteries or veins, or his lungs; (3) Chung's statement, "Hang in there. Don't die on me," evinces that Chung did not intend to cause Shylo's death by shooting him; and (4) Chung's conduct in driving Shylo to the hospital and assisting him once at the hospital "bespeak a lack of intent to cause Shylo's death."

---

[11]    Viewing the evidence in the light most favorable to the prosecution, Chung's testimony that he fired a rifle earlier in the day, even if credible, does not necessarily negate the reasonableness of a finding that he fired a gun at Shylo while driving in his car. Accordingly, Chung's argument in this regard is without merit.

The Hawai'i Supreme Court has recognized that "[g]iven the difficulty of proving the requisite state of mind by direct evidence in criminal cases, proof of circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient." State v. Eastman, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996) (citation omitted). "The mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances." Id. It is "not necessary for the prosecution to introduce direct evidence of a defendant's state of mind in order to prove that the defendant acted intentionally[.]" Id. at 140-41, 913 P.2d at 66-67 (citation omitted).

We conclude that there is sufficient evidence that Chung had taken a substantial step in a course of conduct that he intended or knew was practically certain to cause Shylo's death. Shylo's testimony, corroborated by the forensic stipulations regarding the presence of gunshot residue in the car, allow for the conclusion that Shylo was shot at close range. As Chung was driving the car and Shylo was seated in the backseat, it is a reasonable inference that Chung pointed the gun toward the backseat where Shylo was sitting, if not directly at Shylo's body. While the bullets did not in fact hit a major artery, vein, or lung, Chung's conduct did result in a "major" penetration of bullet fragments into the chest cavity. Notwithstanding the smaller size of the fragments, Dr. Kassel testified that, "with gunshot wounds to the chest cavity, there's always a significant chance of death happening. . . . [H]aving a

bunch of small bullets inside the chest cavity posed a risk to life, in my opinion." Based on the evidence, a jury could reasonably infer that Chung was, at a minimum, "aware that it [was] practically certain that his conduct" could cause Shylo's death. See HRS § 702-206(2)(c).

Finally, Chung's argument that his remarks and conduct following the shooting "bespeak a lack of intent to cause Shylo's death" is without merit. Showing remorse and aiding in mitigating the effects of criminal conduct does not necessarily preclude a finding that Chung acted with the requisite intent in the first instance. See Grace, 107 Hawai'i at 139, 111 P.3d at 34. Viewing the evidence in the light most favorable to the prosecution and giving deference to the credibility determinations of the jury, the court concludes there was substantial evidence to convict Chung of Attempted Murder in the Second Degree.

Chung also asserts that the State failed to produce substantial evidence that Chung possessed the gun that was used to shoot Shylo and thus his convictions for use of a firearm during the course of committing a felony or knowing possession of a pistol or revolver in a place other than his place of business, residence or sojourn must be reversed.

In order to convict Chung for Use of a Firearm While Engaged in the Commission of a Separate Felony, the State was required to present substantial evidence that he knowingly carried on his person or had within his immediate control or did intentionally use or threaten to use a firearm while engaged in

the commission of a separate felony, in this case, attempted murder in the second degree, regardless of whether the weapon was loaded or operable. HRS § 134-21(a). In order to convict Chung for violating Place to Keep Pistol or Revolver, the State was required to present substantial evidence that he failed to confine a firearm to his place of business, residence, or that he failed to carry the firearm unloaded and in an enclosed container between certain prescribed locations. HRS § 134-25.

Viewing the evidence in the light most favorable to the prosecution, the court finds that the prosecution produced substantial evidence to sustain the convictions. As stated above, the forensic stipulations allow for the inference that Chung possessed a firearm in his vehicle at the time of the shooting. Taken together with Shylo's testimony of Chung's remarks and the severity of Shylo's injuries, there was substantial evidence that Chung used the firearm to take a substantial step in a course of conduct that he intended or knew was practically certain to cause Shylo's death, *i.e.*, in the commission of the crime of attempted murder in the second degree in violation of HRS § 134-21. From the evidence presented, including the forensic stipulations, the court finds there was substantial evidence to sustain this conviction. We also conclude that there was substantial evidence to conclude that Chung committed the separate offense of Place to Keep Pistol or Revolver in violation of HRS § 134-25.

Accordingly, we reject Chung's first point of error.

B.   Prosecutorial Misconduct

Chung asserts that the DPA committed prosecutorial misconduct during closing argument when he argued that Chung lied because his testimony was not consistent with defense counsel's opening statement.  He further contends that these statements were an improper expression of the DPA's personal view as to Chung's credibility.

Chung did not object to these remarks at trial. Therefore, we review each of Chung's allegations of prosecutorial misconduct for plain error.  See, e.g., Wakisaka, 102 Hawai'i at 513, 78 P.3d at 326.  This requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction."  Id. (citation and internal quotation marks omitted). The factors that must be considered in conjunction with this determination are:  (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.  Id.

The challenged statements made by the DPA during closing argument are as follows:

> [Y]ou saw [defense counsel] . . . stand up and tell you this is what the evidence [is] going to show:  The defendant shot Shylo; that it was a mistake that turned out -- that went wrong.  Do not consider that statement because that's not what the evidence shows.  The evidence shows it's defendant's own testimony, "I never shot 'em."  And whether you believe that or not, that's up to you.  But it's pretty apparent that the defendant shot Shylo, and that he's now lying on the stand about this, making excuse[s].
>
> He says -- [defense counsel] said in opening statement, "Well, the evidence will show that there's a .22 caliber gun on his lap."  Defendant says, "I never had a gun that day." Another lie.

24

Recently, the Hawai'i Supreme Court specifically addressed the propriety of a prosecutor's statements to a jury that a defendant lied while testifying. State v. Austin, 143 Hawai'i 18, 422 P.3d 18 (2018). In Austin, the prosecutor asserted during closing argument that the defendant had "lied" to the police in his prior recorded statement and "lied" to the jury while testifying at trial. Id. at 27, 422 P.3d at 27. In a 3-2 decision, the majority characterized these statements as "functionally equivalent" to the prosecutor stating, "I think [defendant] lied to you," because it "inherently involved a degree of personal, judgmental evaluation." Id. at 51, 422 P.3d at 51. The court reiterated the rule that "counsel are prohibited from expressing personal opinions . . ., inferential or otherwise, as to the veracity of a witness's testimony," as it "impermissibly 'invades the province of the jury by usurping its power to make credibility determinations.'" Id. at 51-52, 422 P.3d at 51-52. (citation omitted). This is particularly concerning where a prosecutor "stresses to the jurors that the defendant lied to them." Id. at 53, 422 P.3d at 53 (emphasis in original). Citing the "extremely minimal utility the term 'lie' and its derivatives have over more neutral alternatives," the court held "that a prosecutor's assertion that a defendant or witness lied to the jury is improper and should not be permitted." Id. at 56, 422 P.3d at 56.

Accordingly, based on the majority's holding in Austin, we conclude that the prosecutor's remarks during closing

argument, that Chung was "lying on the stand" and that he had proffered "[a]nother lie" while testifying, were improper.

Next, we consider the extent to which a trial court's instruction to the jury minimized or eliminated the prejudicial effect of misconduct as well as the evidence outweighing this impropriety. Wakisaka, 102 Hawai'i at 513, 78 P.3d at 326; State v. Underwood, 142 Hawai'i 317, 325, 418 P.3d 658, 666 (2018) (citing Rogan, 91 Hawai'i at 412, 984 P.2d at 1238). "[A] prosecutor's improper remarks are [generally] considered cured by the court's [curative] instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." Underwood, 142 Hawai'i at 327, 418 P.3d at 668 (citation omitted). However, where the instruction does not specifically address the problematic nature of the prosecutor's statements and is merely a general instruction delivered to the jury before closing arguments begin, it is unlikely to cure the prejudice created by the prosecutor's improper remarks. Id. at 327-28, 418 P.3d at 668-69.

Here, the court delivered the following instructions to the jury before closing arguments began:

> Ladies and gentlemen, shortly, you'll be receiving closing arguments of the attorneys. Again, what you must remember is that the closing arguments by the lawyers are not evidence. It's what the lawyers believe the evidence has shown in the case. You may consider their arguments to you, but you are not bound by their interpretation or their recollection of the evidence.

No other curative instructions were given and defense made no objection at trial to prompt the court to take any other curative measure. As there are no "specific curative instruction" relating to the improper remarks, this factor weighs

26

in favor of vacating Chung's conviction. See, e.g., Underwood, 142 Hawaiʻi at 328, 418 P.3d at 669; Rogan, 91 Hawaiʻi at 415, 984 P.2d at 1241; State v. Basham, 132 Hawaiʻi 97, 111, 319 P.3d 1105, 1119 (2014).

As to the final factor, the court weighs the evidence supporting Chung's conviction to determine whether it is "so overwhelming as to outweigh the inflammatory effect" of the improper comments. If so, we regard the impropriety as ultimately harmless. Rogan, 91 Hawaiʻi at 415, 984 P.2d at 1241. Conversely, "[w]hen it cannot be said beyond a reasonable doubt that the same result would have been reached absent the improper conduct, however, the defendant's conviction must be vacated." Underwood, 142 Hawaiʻi at 328, 418 P.3d at 669.

In cases where the prosecutor's improper remarks relate to the credibility of a witness, the supreme court has assessed the relative significance of the particular witness's credibility to the case in light of other evidence in the record supporting a guilty verdict. For example, in Austin, the record contained evidence of the defendant's DNA inside the murder victim. 143 Hawaiʻi at 24, 422 P.3d at 24. Additionally, the defendant testified inconsistently with his previous statement to police. Id. at 25, 422 P.3d at 25. Despite the prosecutor's comments to the jury that defendant had "lied to the police" and "lied to you," the court found these improper remarks harmless "[g]iven the strength of the evidentiary record in this case, particularly the DNA evidence conclusively tying [defendant] to the deceased and to the scene of the crime near the time the crime was

committed." Id. at 56, 422 P.3d at 56; see also State v. Ganal, 81 Hawai'i 358, 362-65, 367-68 917 P.2d 370, 374-77, 379-80 (1996) (finding prosecutor's challenged remarks harmless in light of the number of other witnesses that testified and the abundant forensic evidence).

Conversely, "[w]hen a conviction is largely dependent on a jury's determination as to the credibility of [the witness]'s testimony," such evidence may not sufficiently outweigh the improper statements that directly degrade the credibility of the witness. Underwood, 142 Hawai'i at 329, 418 P.3d at 670. In Underwood, the court found improper the prosecutor's insinuations that defense counsel had attempted to induce the complaining witness to perjure herself during cross-examination. Id. at 325-27, 418 P.3d at 666-68. In reviewing the weight of the evidence in support of the defendant's conviction, the court noted that while testimony from other witnesses and the physical evidence in the record "indicated the surrounding circumstances were generally consistent with [complaining witness]'s account of events, only the statements of [complaining witness] herself directly described the actual acts constituting the two offenses." Id. at 328-29, 418 P.3d at 669-70. Moreover, the potential for prejudice was "particularly evident" where the improper comments specifically regarded the credibility of the testimony "on which the case turned." Id. at 329, 418 P.3d at 670; see also Rogan, 91 Hawai'i at 415, 984 P.2d at 1241 ("There were no independent eyewitnesses or conclusive forensic evidence in this case. . . . Under these circumstances,

we cannot say that the evidence of criminal conduct against [defendant] was overwhelming."); State v. Marsh, 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986) ("The pivotal issue was the credibility of the witnesses. The jury had to decide whether to believe the victim or the alibi witnesses. We cannot conclude beyond a reasonable doubt that the prosecutor's remarks [that defendant lied] had little likelihood of influencing this critical choice.").

While the evidence in this case is sufficient to sustain the convictions, see supra Section III.A., it is not "overwhelming." There was no witness testimony, including from the complaining witness himself, directly describing the shooting in this case or Chung's possession of a pistol or revolver in or near his vehicle on the day in question. Shylo testified to waking up to the sound of two gunshots but did not see who fired those shots and initially told police he did not know who had shot him. The other passenger in the car and only other potential eyewitness, Josh, declined to testify regarding any details of the incident. Chung, on the other hand, specifically denied shooting Shylo. Chung also denied possessing a pistol or revolver in his car that day and there was no contradictory testimony from any witnesses having seen such a gun in Chung's vehicle or possession. The prosecutor's attack on Chung's credibility undermines the testimonial evidence on which his defense primarily rests.

There is also a lack of conclusive forensic evidence on which the jury could have relied in finding Chung guilty. The

gun used to shoot Shylo was never recovered, and thus no ballistic testing was conducted, and the forensic stipulations regarding the gunshot residue on Chung's hands are not conclusive as to whether Chung fired the gun. Another possible conclusion to which the parties stipulated was that Chung "may have come into contact with an item with gunshot residue on [it]," which does nothing more than corroborate the undisputed fact that Chung came into contact with Shylo while helping him out of the car at the hospital after he had been shot. While the video surveillance evidence and Chung's own testimony tie him to the scene near the time of the shooting, only Shylo's testimony that Chung made inculpatory statements provides further evidence that Chung discharged the gun and injured Shylo.

The case therefore "largely hinges" on the credibility of Chung's testimony. If credible, the jury could have essentially had an entirely different version of the day's events, to wit: that they stopped at Makakilo Gardens not as a result of Shylo having been shot, but as a place to smoke methamphetamine during their drive for the day; that Chung got gunshot residue on his hands from helping Shylo or when he fired a gun previously in the day; that Shylo's reporting of Chung's statements was insufficient to overcome reasonable doubt; that Chung did not possess a pistol or revolver in his car or at any time on the day in question; and, ultimately, that Chung did not cause Shylo's injuries or discharge a firearm at him. Chung's testimony, in the context of the inconclusive forensic evidence and lack of witnesses to the shooting, could therefore have given

rise to reasonable doubt as to each of the charges. Finally, because the prosecutor's remarks "specifically concerned" Chung's credibility, the "potential for prejudice is particularly evident." See Underwood, 142 Hawai'i at 329, 418 P.3d at 670. The court concludes that, had the prosecutor not improperly remarked on Chung's credibility, there is at least "a reasonable possibility that the jury would have reached a different verdict." See Austin, 143 Hawai'i at 56-57, 422 P.3d at 56-57.

Accordingly, we conclude that Chung's conviction must be vacated and this case must be remanded for a new trial.

C. Jury Instructions

Chung contends that the Circuit Court erred in failing to instruct the jury on the lesser-included offense of Reckless Endangering in the Second Degree and that the error was not harmless beyond a reasonable doubt. The State counters that regardless of whether Reckless Endangering in the Second Degree is a lesser-included offense of Attempted Murder in the Second Degree, there was no rational basis for the jury to convict Chung of reckless endangerment under the facts of the case. The State further asserts that any purported error was harmless, because the Court instructed the jury for Assault in the Second Degree, and the jury opted to convict Chung of Attempted Murder in the Second Degree instead.

To be sufficient, "jury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense

charged and convicting the defendant of the included offense." Flores, 131 Hawai'i at 51, 314 P.3d at 128.

Reckless Endangering in the Second Degree is considered a lesser included offense of Attempted Murder in the Second Degree. See State v. Feliciano, 62 Haw. 637, 638, 618 P.2d 306, 308 (1980) ("[w]e believe that reckless endangering in the second degree is a lesser included offense of attempted murder under HRS § 701-109(4)(a)"), superseded by statute on other grounds as stated in State v. Rumbawa, 94 Hawai'i 513, 516-21, 17 P.3d 862, 865-70 (App. 2001); State v. Samonte, 83 Hawai'i 507, 541, 928 P.2d 1, 35 (1996) (relying on Feliciano, 62 Haw. at 640, 618 P.2d at 308); State v. Smith, 91 Hawai'i 450, 464-65, 984 P.2d 1276, 1290-91 (App. 1999). Thus, the inquiry shifts to "whether any view of the evidence in this case presented a rational basis for the jury to acquit [Chung of Attempted Murder in the Second Degree] and, alternatively, to convict him of [Reckless Endangering in the Second Degree]." Flores, 131 Hawai'i at 53, 314 P.3d at 130 (emphasis added).

Although it is undisputed that Shylo was injured by having been shot, the record allows for a conclusion that this injury was not in fact caused by intentional behavior. None of the witnesses, including the defendant or the complainant, testified as to the actual events surrounding the shooting and Shylo testified that he was "puzzled" as to why this had happened. Chung denied having shot Shylo and, if believed, that testimony could have allowed a reasonable juror to acquit Chung for Attempted Murder in the Second Degree. Thus, it must be

determined whether a jury could have convicted Chung of reckless endangering for having "[e]ngage[d] in conduct that recklessly place[d] [Shylo] in danger of death or serious bodily injury." HRS § 707-714 (2014)[12]; Flores, 131 Hawai'i at 55, 314 P.3d at 132. "'The law permits an inference of the requisite intent from evidence of the words or conduct of the defendant.'" Flores, 131 Hawai'i at 54, 314 P.3d at 131 (quoting State v. Stuart, 51 Haw. 656, 657, 466 P.2d 444, 445 (1970)). Here, there is testimony that Chung, upon noticing Shylo's injuries, remarked, "Hang in there. Don't die on me." Additionally, Chung did not make any further attempts to injure or kill Shylo and he affirmatively aided Shylo in obtaining medical treatment, driving him to two hospitals and helping him out of the car into a wheelchair. See, e.g., Smith, 91 Hawai'i at 467, 984 P.2d at 1293 (relying on the defendant's similar conduct following a shooting to establish reckless, and not intentional, conduct). Assuming a finding that Chung fired the gun, these words and conduct could be indicative of an unintended result, rather than an intent to cause death.

Therefore, we conclude that there was a rational basis for a verdict acquitting Chung of Attempted Murder in the Second Degree and convicting him of the included offense of Reckless Endangering in the Second Degree. The Circuit Court erred in failing to give the requested jury instruction on the lesser-

---

[12] HRS § 707-714 provides, in relevant part:

§ 707-714 **Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if the person:
    (a)    Engages in conduct that recklessly places another person in danger of death or serious bodily injury[.]

included offense of Reckless Endangering in the second Degree. See Flores, 131 Hawai'i at 55, 314 P.3d at 132.

As we have already determined that Chung's conviction must be vacated, we need not reach the issue of whether the instructional error was harmless.

IV.   CONCLUSION

For the foregoing reasons, we vacate the Circuit Court's December 9, 2015 Judgment and remand this case for a new trial.

DATED: Honolulu, Hawai'i, October 31, 2018.

On the briefs:

Jon N. Ikenaga,
Deputy Public Defender,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge